UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES STEVENSON,

                Plaintiff,

v.

MEGAN J. BRENNAN, Postmaster
General of the United States,

                Defendant.

Case No. 06-15182

Paul D. Borman
United States District Judge

David R. Grand
United States Magistrate Judge

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND REFERRING THE MATTER TO FACILITATIVE MEDIATION

This is a civil rights action brought by Plaintiff James Stevenson against Megan J. Brennan, Postmaster General of the United States, in her official capacity as chief executive officer of the United States Postal Service (**"USPS"** or **"Defendant"**). Plaintiff alleges that Defendant has taken a variety of adverse employment actions against him in violation of Title VII, 42 U.S.C. § 2000e *et seq.*, over the years: some for discriminatory reasons, on the basis of his gender; and others for retaliatory reasons, owing to his frequent participation in union grievances, Equal Employment Opportunity Commission (**"EEOC"**) proceedings, and other legal and administrative actions concerning the USPS.

Before the court is Defendant's Motion for Partial Summary Judgment. Through that Motion, Defendant seeks summary judgment as to a set of specific,

discrete actions by Defendant that Plaintiff has alleged as bases for his discrimination and retaliation claims. Defendant also seeks summary judgment on the remedial issue of front pay. For the reasons discussed below, the Court will grant in part Defendant's Motion to the extent that it seeks summary judgment on the specified actions, and will deny in part Defendant's Motion to the extent that it seeks summary judgment on the issue of front pay. The Court will also refer the matter to facilitative mediation under E.D. Mich. L.R. 16.4, which is to be conducted pursuant to the specific terms set forth in Section III.D of this Opinion and Order.

## I.  BACKGROUND

### A.  Factual Background

Plaintiff has alleged numerous potential factual bases for his discrimination and retaliation claims. The scope of Defendant's Motion for Partial Summary Judgment does not include all of them, and is instead cabined to several discrete alleged actions by Defendant that Plaintiff asserts as factual predicates for one or both of his claims. The following factual summary sets forth only those facts that are relevant to Defendant's Motion for Partial Summary Judgment.

### 1.  Plaintiff's Employment Background and Alleged Protected Activities

Plaintiff began working for Defendant in 1986 as a letter carrier assigned to the USPS station in Detroit's Brightmoor neighborhood. (ECF No. 77, Pl.'s Resp. Ex. 1, 2006 Deposition of James Stevenson at 14:24-15:7.) In either 1997 or 1998,

Plaintiff began work as a window distribution clerk (officially a "Sales and Service Associate") with the job designation of "part-time regular" (**"PTR"**). (2006 Stevenson Dep. 14:6-15.)

Plaintiff has a robust history of labor union participation, and held several different union positions during the relevant time period. Starting in or around 1992, he served as a union steward for the National Association of Letter Carriers for approximately a year. (2006 Stevenson Dep. 16:8-18.) Plaintiff took his first union steward position with the American Postal Workers Union (**"APWU"**) in 2003, was elected to the position of APWU's Clerk Craft Director in 2009, and was appointed to the position of National Business Agent with APWU in 2014. (Pl.'s Resp. Ex. 2, 2015 Deposition of James Stevenson at 9:14-12:5; 2006 Stevenson Dep. 16:19-25.)

Both in connection with his union positions and of his own accord, Plaintiff has filed numerous Equal Employment Opportunity (**"EEO"**) complaints over the years, including 13 EEO complaints on his own behalf between 2004 and 2013. (Pl.'s Resp. Exs. 3-15.) He also represented at least six other union members in EEO proceedings beginning in 2007. (Pl.'s Resp. Exs. 18-23.)

Between February 2007 and February 2008, Plaintiff participated in a grievance proceeding between APWU and Defendant, which arose from allegations that Defendant deployed letter-carrier employees to perform work that clerical employees (including Plaintiff) were entitled to perform under the governing

national collective bargaining agreement. That proceeding resulted in a $90,000 arbitration award against Defendant. Plaintiff's participation in these proceedings included testifying at the arbitration hearing on December 12, 2007. (Pl.'s Resp. at 4, Pg ID 2269; Exs. 29-30.)

In 2010, Plaintiff filed a charge against Defendant with the National Labor Relations Board ("**NLRB**"), alleging that Defendant had consistently refused or failed to turn requested documents over to Plaintiff (in his capacity as an APWU official), which "severely prejudiced the union in the identifying, processing, and adjudication of grievances and/or employee representation." (Pl.'s Resp. Ex. 35, NLRB Charge No. 7-CA-52751 at Pg ID 2933; Pl.'s Resp. at 4-5, Pg ID 2269-70.) This proceeding resulted in the entry of a Consent Order by the Sixth Circuit in 2012, which required Defendant to (among other things) refrain from failing to answer, ignoring, delaying responses to, or otherwise acting in bad faith concerning information requests by labor organizations. (Pl.'s Resp. Ex. 36, Consent Order at 2, Pg ID 2944.) The Consent Order also required Defendant to maintain certain record-keeping practices as to information requests, to provide managerial employees with instructions and training regarding the disclosure of requested information, and to engage in other specified practices to ensure the disclosure of information to which labor organizations would be entitled under the National Labor Relations Act. (*See id.* at 2-7, Pg ID 2944-49.)

Between 2010 and 2012, Plaintiff was involved in a class action EEO proceeding based on allegations that Defendant violated a collective bargaining agreement by maintaining certain employment practices. That action resulted in a substantial award for the affected employees. (*See* Pl.'s Resp. at 3-4, Pg ID 2268-69; Exs. 24-25.)

In 2013, Plaintiff participated in a grievance proceeding based on allegations that between 2009 and 2011, Defendant had assigned part-time employees to work beyond permissible hourly limits in lieu of full-time clerks that had been laid off. This proceeding resulted in an award of approximately $500,000 distributed among 882 employees. (Pl.'s Resp. Exs. 31- 32.)

## 2. Defendant's Alleged Adverse Employment Actions Against Plaintiff

### a)      Seven-Day Suspension (September 2004)

In an EEO complaint filed on December 3, 2004, Plaintiff alleged that he received a seven-day suspension on September 25, 2004 for being out of uniform. (Pl.'s Resp. Ex. 3, Records Related to EEO 4J-481-0187-04 at Pg ID 2405.) Plaintiff testified in a 2015 deposition that because he did not work more than 30 hours per week, he was not required under his contract to wear a uniform, and in fact had been routinely wearing the blue jeans that he was suspended for wearing for ten years. (2015 Stevenson Dep. 21:4-22:5.) Plaintiff also testified that several similarly situated female employees were not themselves disciplined for wearing jeans or

neglecting to wear a uniform. (2015 Stevenson Dep. 18:10-20:23.)

The suspension was rescinded in full on November 17, 2004, approximately two weeks before Plaintiff filed the EEO complaint. (ECF No. 68, Def.'s Mot. Ex. 33, 04/27/05 EEO Appeal Decision at 2, Pg ID 902; ECF No. 101, Pl.'s Suppl. Mem. at 1-2, Pg ID 4124-35 (citing Ex. 100, Supplemental Records at Pg ID 4154).)

### b) Notice of Excessing and Reassignment to Jefferson Station (November 2008 to January 2009)

In an EEO Investigative Affidavit dated May 6, 2009, Detroit Postmaster Lloyd Wesley averred that in late 2008, owing to "a reduction [in] mail volume, revenue and retail activity," the USPS undertook a "reorganization of Clerk staffing at the city stations in Detroit [in] an attempt to match staffing to new workload realities. The overall reconfiguration of clerical staffing affected numerous employees including full-time regulars and part-time regulars." (Def.'s Mot. Ex. 4, EEO Affidavit of Lloyd Wesley at ¶ 3.) In a letter dated September 25, 2008, Wesley advised APWU President Dwight Boudreaux of the forthcoming "repositioning of clerks in the 482[1] Stations and Branches," and wrote that "[t]he Postal Service is taking this action due to the severe drop in volume and revenue, coupled with automation/mechanization impacts that have increased efficiencies. These events

---

[1] "482" refers to the subdivision of USPS stations and branches in Detroit, Michigan and certain outlying areas, grouped under the number "482" because of the first three digits of their zip code. (2015 Stevenson Dep. 22:2-7.)

have reduced the need for 44 positions." (Def.'s Mot. Ex. 5, 09/25/08 Letter.) Wesley then summarized the administrative steps that had been taken to arrive at this determination, and requested that Boudreaux meet with the "482 Complement Committee" on October 3, 2008 "to further discuss the processes to be taken." (*Id.*)

On or about November 26, 2008, Plaintiff received a letter from Wesley indicating that Plaintiff was to be excessed[2] from his section, due to "reduction in mail volume and staffing realignment." (Pl.'s Resp. Ex. 49, 11/26/08 Letter.) Wesley's letter stated that Plaintiff would become an "unassigned regular" and would be "involuntarily reassigned no sooner than February 1, 2009." (*Id.*)

When in-section bidding for Plaintiff's section took place in December 2008, Plaintiff submitted a bid for his old position, and the bid was successful. (Pl.'s Resp. Ex. 54, 12/2/08 Job Bidding; Ex. 55, 12/22/08 USPS Form 50.) In an EEO Investigative Affidavit dated April 30, 2009, Human Resources Generalist Theresa Zigman averred that Plaintiff

---

[2] "Excessing" occurs when the number of employees in a particular subdivision is greater than what is needed to meet the subdivision's personnel needs. In these circumstances, particular employees are selected to be excessed, typically on seniority grounds, and are either directly reassigned to positions in different subdivisions or locations, or required to bid on open positions as "unassigned regulars." Excessing is distinct from layoffs, since the USPS cannot, under the terms of the national collective bargaining agreement, terminate clerks when there is no work for them. (Def.'s Mot. Ex. 2, Deposition of Jack Leich 27:12-29:17; 2015 Stevenson Dep. 46:25-48:10.)

was improperly awarded the job because the automated bidding system was not capable of recognizing he had been involuntarily reassigned outside of the section. Excessing and involuntary reassignments are not handled in the automated bidding system because there are too many contractual rules which must be followed; and many of those rules rely on the provisions of Local Memorandums of Understanding related to the definition of Sections. Therefore, the job bidding system (which is a National System) cannot be utilized to handle manual tasks associated with excessing. [Plaintiff] had already been notified he was being involuntarily reassigned; however, he ignored the cover letter dated November 28, 2008 and placed a bid in contravention of the instructions on the cover letter . . . .

(Def.'s Mot. Ex. 8, EEO Affidavit of Theresa Zigman ¶ 11.)

On or about December 26, 2008, Plaintiff received a letter from Zigman stating that Plaintiff had been previously notified that he would be excessed out of the section, that as a result his successful bid for his old position was cancelled, and that further instructions on his next assignment were forthcoming. (Pl.'s Resp. Ex. 57, 12/26/08 Letter and Clerk Posting Correction.) Plaintiff received another letter from Zigman dated January 15, 2009, advising that Plaintiff would be reassigned to another location: the "Jefferson Station." (Def.'s Mot. Ex. 11, 01/15/09 Letter.)

While the parties essentially agree on the foregoing factual timeline, they differ over whether Plaintiff was actually excessed. Based on averments in Zigman's Affidavit, Defendant maintains that while Plaintiff was slated to be excessed (and notified of the same), excessing him became unnecessary when another part-time clerk, Kimberly Green, voluntarily moved out of the section before the section

bidding was complete. (Zigman Aff. ¶ 13.) At that point, Zigman averred, Plaintiff was assigned to the one remaining vacant position within the section, which was at the Jefferson station, and was therefore never actually excessed from his section. (*Id.* ¶ 14.) For his part, Plaintiff agrees that Green's departure "ma[de] it unnecessary for the USPS (apart from retaliation) to excess Stevenson from his PTR position." (Pl.'s Resp. at 16, Pg ID 2281.) That Defendant excessed Plaintiff anyway, Plaintiff argues, supports his claim that Defendant committed an act of retaliation.

### c) Removal from Jefferson Station (January 2009 to July 2009)

In the January 15, 2009 letter from Zigman, Plaintiff was ordered to report to his new position at the Jefferson station on January 17, 2009. (*See* Def.'s Mot. Ex. 11, 01/15/09 Letter.) Zigman also advised in the letter that failure to pass scheme training[3] for the Jefferson station could result in Plaintiff's removal. (*See id.*) Plaintiff received 18 hours and 48 minutes of training, and took the examination three times, but was unable to achieve higher than 26% accuracy; since the passing threshold was 95%, Plaintiff was issued a Notice of Separation for scheme failure on May 18, 2009. (Def.'s Mot. Ex. 12, Notice of Separation.) In an EEO Investigative Affidavit dated September 22, 2009, Eugenia Gregory (one of Plaintiff's supervisors

---

[3] Each station had a "scheme"—a listing of addresses within a particular zip code— that clerks working in that station would have to learn in order to distribute mail to the correct letter carrier routes. (Leich Dep. 31:20-32:7.)

at the Jefferson station) averred that Plaintiff received an additional 30 days to qualify on the scheme after he was issued the Notice of Separation, and that he was also given assignments designed to help him in that regard, but that he ultimately failed to qualify. (Def.'s Mot. Ex. 13, EEO Affidavit of Eugenia Gregory ¶ 16.)

Around this time, APWU filed a grievance regarding the excessing and bidding procedures that had taken place in early 2009. The grievance resulted in an agreement by Defendant to review the procedures insofar as they concerned PTR positions. (Def.'s Mot. Ex. 14, Grievance Settlement.) While that review was pending, Plaintiff's removal was held in abeyance,[4] but once the issues delaying the review had been resolved, Plaintiff's removal was reinstated. (Def.'s Mot. Ex. 16, Abeyance Agreement.) On July 2, 2009, Plaintiff received a letter from Defendant stating that the Notice of Separation would be effective July 6, 2009. (Pl.'s Resp. Ex. 12, Records Related to EEO 4J-481-0105-09 at Pg ID 2595.)

On September 4, 2009, APWU filed a grievance on Plaintiff's behalf challenging the May 18, 2009 Notice of Separation. (Def.'s Mot. Ex. 21, Burkholder

---

[4] The record suggests that the decision to hold Plaintiff's removal in abeyance was made somewhat reluctantly. In a July 9, 2009 email, USPS employee Michael P. Jordan relayed a conversation he had previously had with a union official, in which he told her that he was initially "less than agreeable to hold the Stevenson removal in abeyance" because he "had heard that [Plaintiff] appeared to be intentionally failing his new scheme. I had heard he had copped an attitude and that he appeared to be somewhat of a trouble maker and smart aleck over this." (Def.'s Mot. Ex. 15, Michael Jordan Email.)

Arbitration Award at Pg ID 792-93.)

### d) Assignment to GWY Finance, the Burkholder Award, and Subsequent Removal (December 2009 to May 2010)

Plaintiff was an unassigned clerk for several months after his removal in July 2009. (2015 Stevenson Dep. 86:4-87:19.) On December 16, 2009, Plaintiff successfully bid for a clerk position in the Finance division of Defendant's Detroit GWY facility—referred to in the record as "GWY Finance"—and he returned to work on January 2, 2010. (*See* Pl.'s Resp. at 21, Pg ID 2286; Ex. 68, 12/30/09 Letter.)

The grievance that had been filed on September 4, 2009 regarding the Notice of Separation was resolved against Plaintiff in an Arbitration Award issued by Arbitrator Donald R. Burkholder on May 3, 2010. (Def.'s Mot. Ex. 21, Burkholder Award.) Arbitrator Burkholder took note of APWU's allegations that Plaintiff had been improperly removed from his prior position at the Brightmoor station and required to learn a new scheme at the Jefferson station, and also that Plaintiff had been targeted in this way based on his activism at the Brightmoor station. (*See* Burkholder Award at 7, Pg ID 796.) Nevertheless, Arbitrator Burkholder determined that the Notice of Separation had been issued with "just cause." (*Id.*) In Arbitrator Burkholder's view, there was

> no indication that [Defendant] treated [Plaintiff], a Union activist, differently than it deals with any other employee. Ample opportunities and time were provided to permit obtaining a passing score on the scheme; [Plaintiff] was given notice on several occasions of the

11

consequences of failure [to] obtain a passing score. Both [APWU] and [Defendant] have an interest in dealing with all employees equitably under the Agreement.

(*Id.*)

Defendant interpreted the Burkholder Award as necessitating Plaintiff's removal from the GWY Finance position that he had been assigned to in December 2009, and sent Plaintiff a letter on May 10, 2010 indicating that pursuant to the Burkholder Award, Plaintiff would be removed from that position effective immediately. (Def.'s Mot. Ex. 22, 5/10/10 Letter.) APWU took the position that the Burkholder Award only established that Plaintiff was not entitled to back pay, not that he should be removed; Lee Ward, a Human Resources Manager for Defendant, wrote a letter to APWU on or about May 14, 2010, articulating Defendant's position that had the Burkholder Award been limited in this way, it would have clearly stated as much. (Def.'s Mot. Ex. 23, 5/14/10 Letter.)

### e) The Cannavo Award, Reinstatement, and Later Developments (June 2010 to October 2014)

On June 4, 2010, APWU filed a grievance regarding Plaintiff's May 10, 2010 removal based on the Burkholder Award. While the grievance was still pending, Plaintiff requested reinstatement, which Defendant denied in a letter signed by Ward on June 1, 2011. (Def.'s Mot. Ex. 27, 6/1/11 Letter.) The letter stated that Defendant was not considering requests for reinstatement from former employees, and cited the downturn in the economy and decreasing mail volume as reasons for this. (*Id.*)

12

The grievance challenging Plaintiff's May 10, 2010 removal resulted in two separate Arbitration Awards, both issued by Arbitrator Joseph S. Cannavo, Jr.: one on August 25, 2011 and the other on February 12, 2012. The first of these two Awards determined that the grievance was arbitrable. (Pl.'s Resp. Ex. 70, 8/25/11 Arbitration Award.) The second Award sustained APWU's grievance, and determined that Defendant's removal of Plaintiff on May 10, 2010 was not in fact justified by the Burkholder Award. (Def.'s Mot. Ex. 24, 2/12/12 Arbitration Award ("**Cannavo Award**").) Specifically, Arbitrator Cannavo determined that once Defendant awarded Plaintiff a notice that he was the successful bidder for the position at GWY Finance, Defendant obviated the Notice of Separation that it had previously issued to Plaintiff, and that at that point "the matter left to be decided by Arbitrator Burkholder was a matter of remedy, and nothing more." (Cannavo Award at 30, Pg ID 834.) In other words, Arbitrator Cannavo agreed with APWU's position that the Burkholder Award was limited to the question of back pay, and did not justify removing Plaintiff from the job that Defendant independently assigned him to in early 2010. Arbitrator Cannavo thus required Defendant to reinstate Plaintiff and give him appropriate back pay. (*See id.* at 32, Pg ID 836.)

Pursuant to the Cannavo Award, Defendant restored Plaintiff to his position at the GWY location effective April 5, 2012. (Pl.'s Resp. Ex. 72, 4/4/12 Letter.) Plaintiff then pursued a grievance regarding his transfer from the Brightmoor station

to the Jefferson station, and ultimately secured a pre-arbitration settlement from Defendant that included compensation for travel costs, lost wages, and lost benefits. (Pl.'s Resp. Ex. 73, 3/18/14 Pre-Arbitration Settlement Agreement.)

Plaintiff went on leave from Defendant in October 2014 when he was appointed National Business Agent for APWU, a term position based in Chicago that was subject to expiration in November 2016, at which point Plaintiff would have to be elected in order to remain in the position. (2015 Stevenson Dep. 10:11-12:20.) While in that position, Plaintiff was on unpaid leave, but could return to work for Defendant at his discretion. (2015 Stevenson Dep. 296:25-297:4.) In June 2016, Plaintiff represented that he would be running unopposed for an additional three-year term. (ECF No. 95 at Pg ID 4103.) At the February 24, 2017 hearing before this Court on Defendant's Motion for Partial Summary Judgment, Plaintiff's counsel represented that Plaintiff had been elected to a second term.

## B. Procedural History

Plaintiff filed the initial Complaint in this action on November 20, 2006. (ECF No. 1.) Amended Complaints were filed in 2008, 2010, and 2011. (ECF Nos. 14, 24, 35.) Plaintiff filed the Fourth Amended Complaint, which is the operative complaint in this action, on May 15, 2014. (ECF No. 55, 4th Am. Compl.) The Fourth Amended Complaint asserts two claims: gender discrimination under 42 U.S.C. § 2000e-2 (Count I), and retaliation under 42 U.S.C. § 2000e-3 (Count II).

14

The Fourth Amended Complaint alleges various factual predicates for each of Plaintiff's two claims. In support of the gender discrimination claim in Count I, the Fourth Amended Complaint alleges Defendant took various actions towards Plaintiff that it did not take towards similarly situated female employees, including:

- Suspending Plaintiff for seven days for wearing blue jeans (but then withdrawing the suspension before it was served) (4th Am. Compl. ¶ 99(A));

- Issuing Plaintiff disciplinary notices for wearing winter boots and "otherwise harass[ing]" him (*id.* ¶ 99(B));

- Cutting Plaintiff's hours and not permitting him to return in the evening to work additional hours (*id.* ¶ 99(C));

- Conducting an "official discussion" with Plaintiff based on three alleged infractions of an attendance policy (*id.* ¶ 99(D));

- Reprimanding him for "missing a clock ring" (*id.* ¶ 99(E));

- Excessing Plaintiff from his position, removing him from a successful bid award, transferring him to a new station and requiring him to learn its scheme, and terminating him for scheme failure (*id.* ¶ 99(F)); and

- Informing Plaintiff that there was no work available while "hid[ing] female clerks in jobs they were not supposed to be placed" in (*id.* ¶ 99(G)).

As to Count II, the Fourth Amended Complaint alleges the following acts of retaliation by Defendant, all allegedly in reprisal for Plaintiff's EEO activities:

- In January 2007, Defendant "threatened [Plaintiff] and informed him that his work schedule would be changed to conflict with [Plaintiff]'s other job" (4th Am. Compl. ¶ 103(A));

15

- In June 2008, Defendant "wrongfully evicted [Plaintiff] from a building and [gave him] a letter of warning" (*id.* ¶ 103(B));

- In November and/or December 2008, Defendant targeted Plaintiff for excessing and "improperly removed [him] from a bid award" (*id.*);

- In January 2009, Defendant "improperly placed [Plaintiff] at another station and required him to learn [a] new scheme" (*id.* ¶ 103(C));

- In or around May 2009, Defendant issued Plaintiff a termination notice for scheme failure (*id.*);

- In June 2009, despite having agreed to hold Plaintiff's termination in abeyance until the resolution of the grievance on PTR clerk excessing, Defendant "refused to arbitrate the case as the grievance would prevent [Plaintiff]'s initial termination" (*id.* ¶ 103(D));

- In or around July 2009, Defendant "falsely reported that [Plaintiff] had a gun, placing [his] life at risk," and thereafter terminated his employment (*id.* ¶ 103(E));

- In May 2010, Defendant "again terminated [Plaintiff]'s employment" (*id.* ¶ 103(F));

- At an unspecified time, Defendant (through human resources manager Lee Ward) "wrote to request [Plaintiff]'s removal as union steward," called "postal police on numerous occasions to have [Plaintiff] surrounded and escorted off of postal property . . . in front of other employees," and "sent emails throughout the district . . . stating that [Plaintiff] had been fired and was not allowed to enter any facilities" (*id.* ¶ 103(G));

- In or around January 2011, Defendant "refused to reinstate [Plaintiff] to one of 42 vacant, available part-time positions, including the position [he

had] held for approximately 10 years[, which] was vacant at that time" (*id.* ¶ 103(H));

- In January 2012, Defendant "refused an arbitrator's order to immediately reinstate [Plaintiff]," sent "emails to circumvent the arbitration award," and did not in fact reinstate him until April 2012, "after the National Union threatened to take the [Defendant] to federal court to enforce the arbitration award reinstating [Plaintiff], with back pay and all benefits" (*id.* ¶ 103(I));

- In or around August 2012, Defendant "once again attempted to remove [Plaintiff] from Detroit by excessing 46 employees," and since "[Plaintiff]'s name would have been the 46th and last name on the list," Defendant "changed the numbers for the calculations, since only the first 19 names were subject to being excessed" (*id.* ¶ 103(J)).

The parties conducted discovery between February and July of 2015. Defendant then filed the instant Motion for Partial Summary Judgment on September 3, 2015. (ECF No. 68.) At the same time, Defendant filed an *ex parte* motion for leave to file a 28-page brief (ECF No. 67), which the Court granted (ECF No. 69). After the Court struck Plaintiff's initial Response for having incorrect type size (ECF No. 76), Plaintiff filed a revised Response on October 27, 2015 (ECF No. 77). The parties stipulated to extend Defendant's time to file its Reply (ECF No. 79), and Defendant timely filed the Reply (ECF No. 81) on November 16, once again with the Court's leave to file excess pages (ECF No. 82).

Among the four exhibits to Defendant's Reply were two sworn Declarations. (ECF No. 81, Ex. 34, Declaration of Nicole Collins-Earley; ECF No. 81, Ex. 36,

Declaration of Michael Greene.) Plaintiff filed objections to these Declarations on February 23, 2016. (ECF Nos. 85, 86.) Six days later, this Court directed Defendant to respond to Plaintiff's objections. (ECF No. 87.) Defendant complied in a timely fashion, filing its Statement of Response on March 11, 2016. (ECF No. 88.)

Plaintiff filed a 143-page reply to Defendant's Statement of Response on March 24, 2016. (ECF No. 89.) Defendant moved to strike the reply, as it was neither ordered by the Court nor permitted by court rule; that Motion to Strike saw a full round of briefing, ultimately including a motion by Plaintiff for leave to file a sur-reply. (ECF Nos. 90-93.) Shortly thereafter, the Court ordered the parties to Facilitative Mediation. (ECF No. 96.) An October 5, 2016 docket entry indicates that the case did not settle.

On December 1, 2016, the Court granted Defendant's Motion to Strike, and stated that "[t]he summary judgment briefing in this case is closed and no further filings will be accepted by the Court." (ECF No. 98.)

On February 23, 2017, this Court issued an Opinion and Order sustaining in part and overruling in part Plaintiff's evidentiary objections. (ECF No. 100, February 23, 2017 Opinion and Order.)

On February 24, 2017, the Court held a hearing on Defendant's Motion for Partial Summary Judgment. At the hearing, the Court noted on the record that Defendant had raised an issue concerning Plaintiff's alleged 2004 suspension for the

first time in its Reply, and gave Plaintiff the opportunity to file a supplemental brief on that issue. Plaintiff did so on March 9, 2016. (ECF No. 101, Pl.'s Suppl. Mem.) As the matter is ripe for adjudication, the Court now issues the following ruling.

## II. STANDARD OF REVIEW

Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). "A fact is 'material' for purposes of a motion for summary judgment where proof of that fact 'would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties.'" *Dekarske v. Fed. Exp. Corp.*, 294 F.R.D. 68, 77 (E.D. Mich. 2013) (Borman, J.) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"In deciding a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party." *Perry v. Jaguar of Troy*, 353 F.3d 510, 513 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). At the same time, the non-movant must produce enough evidence to allow a reasonable jury to find in his or her favor by a preponderance of the evidence, *Anderson*, 477 U.S. at 252, and "[t]he 'mere

possibility' of a factual dispute does not suffice to create a triable case." *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 576 (6th Cir. 2004) (quoting *Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). Instead, "the non-moving party must be able to show sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy." *Arendale v. City of Memphis*, 519 F.3d 587, 601 (6th Cir. 2008) (quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)). "The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. The plaintiff must present more than a mere scintilla of the evidence. To support his or her position, he or she must present evidence on which the trier of fact could find for the plaintiff." *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000) (internal quotation marks and citations omitted). That evidence must be capable of presentation in a form that would be admissible at trial. *See Alexander v. CareSource*, 576 F.3d 551, 558–59 (6th Cir. 2009).

## III. DISCUSSION

In the Motion for Partial Summary Judgment that is now before this Court, Defendant seeks summary judgment as to a specific and limited set of factual predicates for Plaintiff's discrimination and retaliation claims:

- Plaintiff's claim that he was retaliated against when he was: (1) identified for excessing; (2) removed from a bid at Brightmoor and reassigned to

Jefferson; (3) terminated for failing scheme training; (4) removed in accordance with an arbitration award; and (5) denied reinstatement;

- Plaintiff's claim that he was discriminated against when he: (1) received a suspension for being out of uniform; and (2) was terminated for failing scheme training; and

- Plaintiff's claim that he was constructively discharged.

(Def.'s Mot. at 2, Pg ID 543.)

As discussed in detail below, this Court finds that Defendant is entitled to summary judgment on the factual grounds for Plaintiff's retaliation claim that Defendant has specified in its Motion for Partial Summary Judgment, and will grant the Motion as to those grounds. Further, Plaintiff has withdrawn his gender discrimination claim to the extent that it is premised on the two factual grounds Defendant has addressed in its Motion for Partial Summary Judgment, and for that reason the Court will grant Defendant's Motion insofar as it is directed at Plaintiff's gender discrimination claim. The Court will deny Defendant's Motion for Partial Summary Judgment on front pay, however, as that remedial issue implicates factual grounds for Plaintiff's claims that are outside the scope of Defendant's Motion. Finally, the Court will refer this matter to facilitative mediation pursuant to E.D. Mich. L.R. 16.4, and under the terms set forth in Section III.D of this Opinion and Order.

## A.    Gender Discrimination (Count I)

In its Motion for Partial Summary Judgment, Defendant seeks summary judgment as to two alleged acts of gender discrimination: Plaintiff's 2004 suspension for being out of uniform, and Plaintiff's removal for scheme failure in 2009.

Since Defendant filed its Motion, however, Plaintiff has withdrawn his gender discrimination claim to the extent that it is premised on either of these two actions. In his Response to Defendant's Motion, Plaintiff stated that he "withdraws his allegations of gender discrimination, but not allegations of retaliation, in regards to scheme training and removal for scheme failure." (Pl.'s Resp. at 2, Pg ID 2260.) Then, in the supplemental brief that the Court granted Plaintiff the opportunity to file at the February 24, 2017 hearing, Plaintiff represented that he "agrees that the rescission of a proposed suspension does not rise to the level of an 'adverse employment action' so as to support a *prima facie* case of sex discrimination as to [his] 2004 EEO claim." (Pl.'s Suppl. Mem. at 6, Pg ID 4139.) For that reason, Plaintiff stated, "[t]he Court may dismiss Stevenson's 2004 EEO claim." (*Id.* at 7, Pg ID 4140.)

Because Plaintiff has thus withdrawn the only two factual predicates for his gender discrimination claim that are within the scope of Defendant's Motion for Partial Summary Judgment, the Court will grant Defendant's Motion as to the gender discrimination claim asserted in Count I of the Fourth Amended Complaint.

## B.     Retaliation (Count II)

Defendant also seeks summary judgment on several discrete acts as to Plaintiff's retaliation claim: Plaintiff's January 2009 reassignment from the Brightmoor station to the Jefferson station (including the cancellation of his initially successful bid on a position at the Brightmoor station); Plaintiff's May 2009 removal from his position at the Jefferson station for scheme training failure; Plaintiff's May 2010 removal from his position at GWY Finance pursuant to the Burkholder Award; and the June 2011 denial of Plaintiff's reinstatement request.

For the reasons set forth below, the Court finds that Plaintiff has failed to demonstrate that a reasonable jury could find in his favor on a retaliation claim based on any of these factual predicates. Accordingly, the Court will grant Defendant's Motion for Partial Summary Judgment as to these specific factual bases for Plaintiff's retaliation claim.

### 1.     Governing law

Under Title VII's retaliation provision,

> [i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).

Plaintiffs in Title VII retaliation actions may proceed using either direct or circumstantial evidence. *See Abbott v. Crown Motor, Inc.*, 348 F.3d 537, 542 (6th Cir. 2003). "[W]here a plaintiff proceeds on the basis of circumstantial evidence alone, the retaliation claim is examined under the familiar *McDonnell Douglas* evidentiary framework." *Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir. 1987) ("Proof of a retaliation claim under Title VII is governed by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny."). To establish a *prima facie* case of retaliation under this evidentiary framework, a plaintiff must prove that

> (1) [he] engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment.

*Hunter v. Sec'y of U.S. Army*, 565 F.3d 986, 995–96 (6th Cir. 2009) (quoting *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000)). Once the plaintiff has done this, the burden shifts to the employer to articulate a legitimate, nonretaliatory reason for its actions. At that point, "[t]he plaintiff, who bears the burden of persuasion throughout the entire process, then must demonstrate that the proffered reason was not the true reason for the employment decision." *Id.* at 996 (internal quotation marks omitted) (quoting *Canitia v. Yellow Freight Sys.*, 903 F.2d

1064, 1066 (6th Cir. 1990)). The plaintiff can demonstrate that the employer's proffered reason was pretext for retaliation "by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 597 (6th Cir. 2007) (internal quotation marks omitted) (quoting *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 434 (6th Cir. 2002)).

## 2. Retaliatory harassment

As a threshold matter, the parties dispute the precise nature of Plaintiff's retaliation allegations, and therefore disagree on what burden of proof Plaintiff must meet to avoid summary judgment. Plaintiff asserts that he is bringing a claim based on a pattern of "severe or pervasive retaliatory harassment," and that Defendant errs to the extent that it "treats incidents of harassment against Stevenson as separate, discreet [*sic*] events." (Pl.'s Resp. at 10 n.3, Pg ID 2275.) Defendant contends that Plaintiff has not pled a harassment claim, and that Plaintiff must therefore establish a *prima facie* case under the *McDonnell Douglas* framework for each incident of alleged retaliation. In this regard, Defendant is correct.

In *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), the U.S. Supreme Court addressed the limitations period applicable to plaintiffs alleging harassment under Title VII, and in so doing, substantially developed the "hostile

work environment" doctrine applicable in certain Title VII cases. Specifically, the Court defined hostile work environment claims by distinguishing them from "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire[, which] are easy to identify." *Id.* at 114. As the Supreme Court explained,

> [h]ostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. See 1 B. Lindemann & P. Grossman, Employment Discrimination Law 348–349 (3d ed.1996) . . . ("The repeated nature of the harassment or its intensity constitutes evidence that management knew or should have known of its existence"). The "unlawful employment practice" therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own.

*Morgan*, 536 U.S. at 115.

This notion of hostile work environment claims as distinct from discrete-act claims was further developed in *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618 (2007), in which the Supreme Court stated that "[a] discrete act of discrimination is an act that in itself 'constitutes a separate actionable 'unlawful employment practice' and that is temporally distinct," while in a hostile work environment, "the actionable wrong is the environment, not the individual acts that, taken together, create the environment." [5] *Id.* at 638.

---

[5] In 2009, the *Ledbetter* decision was superseded in part by the Lilly Ledbetter Fair Pay Act, Pub.L. No. 111–2, amending 42 USC § 2000e–5, but only as to its holding regarding the calculation of the limitations period in certain Title VII actions.

*Morgan* was a fundamentally procedural case that analyzed the correct method of calculating the limitations period in Title VII hostile work environment claims, and for this reason *Morgan* does not establish beyond doubt that discrete actions such as suspension or termination can never be part of a hostile work environment claim. Nevertheless, *Morgan* and *Ledbetter* demonstrate that there is an important substantive difference between discrete-act claims and hostile work environment claims, and subsequent Sixth Circuit cases have continued to recognize the distinction. *See, e.g., Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 708 (6th Cir. 2007) (characterizing an employer's refusal to honor an employee's request to transfer to a different position as "not . . . the type of on-going harassment which would create a hostile work environment" and "more akin to a discrete act, which is decidedly not actionable as a hostile-work-environment claim"); *Sharpe v. Cureton*, 319 F.3d 259, 268 (6th Cir. 2003) (holding that a series of allegedly retaliatory transfers indisputably "involve[d] discrete acts and not a hostile environment, as they were made aware of the retaliatory transfers on specific dates"). This Court, too, has held that a plaintiff's failure to allege or prove "non-discrete, repeated conduct, occurring over days or years" is fatal to a hostile work environment claim. *Krause v. Lexisnexis*, No. 06-12256, 2007 WL 201023, at *6 (E.D. Mich. Jan. 23, 2007)

---

*Ledbetter*'s elaboration on the nature of hostile work environment claims was unaffected. *See Maher v. Int'l Paper Co.*, 600 F. Supp. 2d 940, 950 n.5 (W.D. Mich. 2009) ("*Ledbetter* remains persuasive authority except where overruled by statute.").

(Borman, J.). "In determining whether an actionable hostile work environment claim exists, the Court must look to 'all the circumstances,' including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Morgan*, 536 U.S. at 115-16).

The Court finds that the allegedly retaliatory actions discussed in Defendant's Motion amount to a series of discrete acts rather than a course of pervasive and harassing conduct. Even putting aside that those actions—involuntary transfer, removal, and denial of a reinstatement request—are paradigmatic examples of the type of discrete actions discussed in *Morgan*, it is unclear what exactly constituted Plaintiff's "work environment" besides the fact of his employment with the USPS. Even that characterization would not necessarily be an accurate description of Plaintiff's "work environment," since Plaintiff was essentially on unpaid leave between his removal and reinstatement. When he was assigned, he was detailed at different times over the relevant period to at least three different stations, and he has not shown that one supervisor or manager was responsible for all of the actions he claims constituted the pattern of retaliatory harassment.

The Court does not interpret the phrase "hostile work environment" so literally as to exclude any claims in which the plaintiff worked at more than one physical location. Rather, the Court concludes that the concept of a hostile work

environment cannot be extended to cover a situation like that presented in this case without the well-recognized distinction between hostile work environments and discrete acts losing most of its meaning. The Court declines to extend the meaning of the term in this way, and finds that as to the individual actions identified by Defendant in the instant Motion for Partial Summary Judgment, Plaintiff has not pled a retaliatory harassment claim.

### 3. Alleged excessing and reassignment to Jefferson station

Defendant seeks partial summary judgment on any retaliation claim based on one or a combination of the following actions: Defendant's sending Plaintiff notice that he would be excessed from the Brightmoor station, removing Plaintiff from a bid that he had entered for a position at the Brightmoor station, and reassigning Plaintiff to the Jefferson station. Plaintiff characterizes these actions as constituting (or contributing to) a pattern of retaliatory harassment, but for the reasons discussed in the previous subsection of this Opinion and Order, the Court will analyze the claims in this action as discrete-act claims rather than a single retaliatory harassment claim.

The parties also differ strenuously over whether Plaintiff was in fact "excessed": Plaintiff claims that he was, while Defendant contends that Plaintiff was *slated* to be excessed, that the need to excess him was obviated, and that he was then reassigned to a different station within the same section (and thus not excessed). This

is a largely semantic dispute, and for present purposes the Court need only analyze the facts surrounding the end of Plaintiff's work at the Brightmoor station and the beginning of his work at the Jefferson station in late 2008 and early 2009 to determine whether Plaintiff has stated a *prima facie* case under the *McDonnell Douglas* burden-shifting inquiry based on those facts.

The first element of the *McDonnell Douglas* test—Plaintiff's engaging in a protected activity—is easily met. Plaintiff filed EEO complaints against Defendant, on behalf of himself and fellow employees, at least once per year between 2004 and 2011. (Pl.'s Resp. Exs. 3-15.) Title VII protects an employee's "participat[ion] in any manner in an investigation, proceeding, or hearing under" the statute. 42 U.S.C. § 2000e-3(a). Traditionally, retaliation claims under the "participation" clause required that the Plaintiff directly participated in a proceeding before the EEOC itself, but the Sixth Circuit has interpreted the law as also protecting participation in internal investigations that occur pursuant to a pending EEOC charge. *See Abbott*, 348 F.3d at 543. There is little question, in any case, that Plaintiff engaged in protected activity. As with the other putative grounds for Plaintiff's retaliation claim, the viability of a retaliation claim based on the alleged excessing and reassignment hinges on one or more of the following issues: (1) whether the decision-maker as to the challenged employment action was aware of Plaintiff's protected activity; (2) whether the challenged action was indeed an "adverse employment action"; and (3)

whether a causal inference between a protected activity and an adverse employment action can be drawn.

The second prong of the *McDonnell Douglas* test in the retaliation context requires a showing that the defendant was aware of the plaintiff's protected activity. Summary judgment is appropriate where the plaintiff is "unable to produce evidence sufficient to establish that the individuals charged with taking the adverse employment action knew of the protected activity." *Mulhall v. Ashcroft*, 287 F.3d 543, 551–52 (6th Cir. 2002); *see also Allen v. Michigan Dep't of Corr.*, 165 F.3d 405, 413 (6th Cir. 1999) (noting that since the defendant had been named "in all the suits filed by [the plaintiff, it would be] disingenuous to argue that [the defendant] was not aware that [the plaintiff] had filed grievances against it").

Thus, Plaintiff must raise a genuine issue of fact regarding an awareness of his protected activity on the part of the individual or individuals who made the decision to take the adverse employment action. Plaintiff has met this burden. Detroit Postmaster Lloyd Wesley averred in an EEO Investigative Affidavit that he "gave final approval for the plan to reduce and realign the staffing of clerks at the stations," and elaborated that "[t]he specific numbers of clerks to be reduced were based on the available workload and windows of operation; along with recommendations from Operations Support and from the Managers, Customer Service Operations. However, the final decision was mine." (Def.'s Mot. Ex. 4, EEO Affidavit of Lloyd

Wesley at ¶ 3.) Wesley was also the author of the letter notifying Plaintiff that his position was going to be excessed.[6] (Pl.'s Resp. Ex. 49, 11/26/08 Letter.) In the same Affidavit, dated May 6, 2009, Wesley denied that he was aware of "any prior EEO activity" by Plaintiff. (Wesley Aff. ¶ 2.) Plaintiff has produced evidence, however, that Wesley discussed internal investigations of Plaintiff's EEO complaints with station manager Ansileen Washington in January 2007. (*Id.* at Pg ID 2564.) This evidence is enough to permit a reasonable finder of fact to conclude that the relevant decision-maker was aware of Plaintiff's protected activity.

Plaintiff must also raise a genuine issue of material fact about the existence of an adverse employment action. The U.S. Supreme Court has held that the test for an adverse employment action in the Title VII context has both an objective component and a materiality standard: "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which . . . means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). The Sixth Circuit has explained that this requires a plaintiff to show "that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from

---

[6] Plaintiff does not appear to dispute that Wesley was the decision-maker with respect to the staffing realignment in late 2008 and early 2009. (*See* Pl.'s Resp. at 6, 8, Pg ID 2271, 2273.)

32

making or supporting a charge of discrimination." *Laster v. City of Kalamazoo*, 746 F.3d 714, 719 (6th Cir. 2014) (internal quotation marks omitted) (quoting *Burlington N.*, 548 U.S. at 57). "[A] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 594 (6th Cir. 2007) (quoting *Ford v. General Motors Corp.*, 305 F.3d 545, 553 (6th Cir. 2002)). "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Id.* Ultimately, actions by employers can meet the material adversity standard in a variety of ways: "an employee's transfer may constitute a materially adverse employment action, even in the absence of a demotion or pay decrease, so long as the particular circumstances present give rise to some level of objective intolerability." *Deleon v. Kalamazoo Cty. Rd. Comm'n*, 739 F.3d 914, 919 (6th Cir. 2014).

Defendant argues that at least as to the initially planned excessing of Plaintiff's position, there was no materially adverse action: even though Plaintiff was notified of an intended excessing, he was not actually excessed, and proposed actions that are not implemented are "generally not sufficient to satisfy the adverse

33

action requirement." *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 182 (6th Cir. 2004). This argument would have some heft if nothing happened after Plaintiff received the notice of excessing, but on a more holistic view of the circumstances—including the cancellation of Plaintiff's bid and his involuntary reassignment to the Jefferson station—it is less obvious that there was no materially adverse employment action. Plaintiff was transferred from a workplace that was a mile from his home (*see* Pl.'s Resp. at 22, Pg ID 2287) and at which he had worked for approximately ten years, to a new location where he would be required to learn a new postal scheme. Putting aside questions of motive or pretext, the Court is not prepared to conclude that no reasonable jury could find that this constituted a materially adverse action.

Yet even assuming that Plaintiff has met his burden on the "adverse employment action" prong of the *McDonnell Douglas* test, he has not done so with respect to the causation prong. "Title VII retaliation claims 'must be proved according to traditional principles of but-for causation,' which 'requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'" *Laster*, 746 F.3d at 731 (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2533 (2013)); *see also E.E.O.C. v. New Breed Logistics*, 783 F.3d 1057, 1070 (6th Cir. 2015) ("[U]nder *Nassar*, a Title VII claimant must show that his or her protected activity was a but-for cause of the adverse action by the employer."). It is generally accepted that temporal proximity

34

between the protected activity and the materially adverse action can serve as causal evidence to some degree. *See Blackmon v. Eaton Corp.*, 587 F. App'x 925, 932 (6th Cir. 2014) (holding that temporal proximity, in conjunction with other evidence of retaliatory animus, was sufficient to establish causation). But there is conflicting authority as to whether temporal proximity alone can ever be enough to meet the burden. *Compare Dean-Lis v. McHugh*, 598 F. App'x 412, 415 (6th Cir. 2015) ("[Plaintiff] conceded at oral argument that timing is the *only* evidence of causation she has. That is not enough to get to a jury. 'Temporal proximity alone,' we have said, 'cannot establish a causal connection.'") (quoting *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 675 (6th Cir. 2013)) *with New Breed Logistics*, 783 F.3d at 1076–77 (upholding jury instructions stating that temporal proximity may prove causation, because the instructions also stated that the retaliation claim required a finding that the adverse action was taken "because of" the protected activity).

Plaintiff's retaliation claim, if premised on the events of late 2008 and early 2009, fails at the *prima facie* stage for lack of causal evidence. Defendant makes two causation arguments. First, Defendant cites authority for the proposition that temporal proximity alone does not show causation. Second, and more significantly for present purposes, Defendant has offered evidence that when Wesley approved the reduction of the workforce at the Brightmoor station by one, he did not know that Plaintiff would be the one excessed. (*See* Wesley Aff. ¶¶ 3-4.)

Plaintiff has not rebutted this evidence. Indeed, Plaintiff's only response to Defendant's argument that Wesley did not know that Plaintiff specifically would be excessed is as follows:

> The USPS argues that Wesley, in excessing the PTR position, did not know that Stevenson would be the PTR employee impacted. . . . Wesley participated in USPS-APWU meetings held in October 2008. After being told that that "We need them [PTRs] at this time", Wesley stated: "We need [a list of] part-time regulars also." This meeting took place on October 3, 2008.

(Pl.'s Resp. at 24-25, Pg ID 2289-90 (record citations omitted).) Plaintiff does not explain how this responds to the assertion that Wesley was not aware that Plaintiff would be the excessed PTR employee, and given Defendant's explanation that that determination was made automatically by seniority (*see* Zigman Aff. ¶¶ 10-13; Leich Dep. 74:4-21), this lack of evidence of awareness on Wesley's part fatally undermines this factual basis for Plaintiff's claim. Plaintiff may have raised a genuine fact issue over whether Wesley was aware of Plaintiff's protected activity at the relevant time, but not over whether Wesley targeted or even was able to target Plaintiff to be excessed.

This failure of proof also undermines Plaintiff's ability to show causation as to his removal from the bid on the Brightmoor position, and as to his reassignment to the Jefferson station. Defendant's overall timeline of these circumstances is that Plaintiff was identified for excessing and notified accordingly, that he improperly

bid in an automated system for his old job, that the bid was rejected because of the planned excessing, that the planned excessing became unnecessary, and that Plaintiff therefore remained in the section but was reassigned to the last open position within it, which was at the Jefferson station. All of the other events in this sequence follow from the initial identification of Plaintiff's position as the position to be excessed; without a causal connection between that first action and Plaintiff's protected activity, there would need to be some independent indication of retaliatory motive as to one of the other actions, and Plaintiff has not demonstrated this.[7]

For the reasons above, the Court will grant Defendant's Motion for Partial Summary Judgment as to the events surrounding Plaintiff's notification of his planned excessing and his reassignment to the Jefferson station.

---

[7] The Court further notes that the record reflects that Zigman was responsible for implementing the excessing and determining which employees would be excessed based on seniority (Zigman Aff. ¶ 10); that it was Zigman who manually removed Plaintiff from his successful initial bid on the Brightmoor position (*id.* ¶ 11); and that Zigman's averments in her April 30, 2009 EEO Investigative Affidavit show that she was unaware of Plaintiff's EEO activities at the time she undertook these actions (*id.* ¶ 3). Defendant thus argues that any theory of Plaintiff's retaliation claim based on actions taken by Zigman fails on the "employer knowledge" prong of the *McDonnell Douglas* analysis.

Plaintiff does not appear to dispute this, as he acknowledges Defendant's argument that Zigman "lacked knowledge of Stevenson's prior EEO activity," but argues in response that Zigman was not the decision maker. (Pl.'s Resp. at 6, Pg ID 2271 ("Zigman simply implemented the posting, bidding and award process for craft employees. The decision to reduce the number of FTR and PTR positions was made by USPS management.").)

### 4. Removal based on scheme failure

Defendant also seeks partial summary judgment as to Plaintiff's allegation that his May 2009 removal for scheme failure was a retaliatory act. Here, there is no dispute over Plaintiff's involvement in protected activities, or over the question of whether the removal was a materially adverse employment action. The key issues, then, are whether the person or persons who made the decision were aware of Plaintiff's protected activity, and whether there was a causal connection between the protected activity and the decision.

As to Defendant's awareness of the protected activity, Defendant argues that "Plaintiff claims that a host of management officials made the decision, but cannot establish that they knew of his protected activity in May 2009." (Def.'s Mot. at 22, Pg ID 563.) Defendant is correct that Plaintiff does not identify a single individual as having made this specific employment decision. When asked in his 2015 deposition who made the decision to remove him for scheme failure, Plaintiff listed nine individuals, and concluded that "[b]asically, all the upper level management officials" were responsible. (2015 Stevenson Dep. 61:3-24.) Records of the EEO complaint that Plaintiff filed in 2009 regarding the removal don't clarify the matter: Plaintiff listed seven names of responsible officials on the Pre-Complaint Counseling Form, two of whom were not named by Plaintiff at the deposition. (*See* Pl.'s Resp. Ex. 12, Records Related to EEO 4J-481-0105-09 at Pg ID 2620.)

Still, there is at least a colorable argument that a reasonable jury could find that Defendant was aware of Plaintiff's protected activity even despite the ambiguity surrounding who made the decision. Plaintiff has raised genuine fact issues about the knowledge of several of the people that he testified were involved with the decision to terminate him for scheme failure. As noted above, record evidence suggests some awareness of Plaintiff's EEO activities on Wesley's part at least as of January 2007. There is also evidence suggesting similar knowledge on station manager Arthur Wallace's part: Plaintiff testified that Wallace raised the topic of Plaintiff's EEO activity with him in early 2007, and remarked: "What do I do with an employee like you?" (2015 Stevenson Dep. 125:10-126:17.) Wallace also averred in a May 27, 2007 EEO Investigative Affidavit that he had "heard about [Plaintiff's] prior EEO activity through the grapevine." (Pl.'s Resp., Ex. 7, Records related to EEO 4J-481-0056-06 at Pg ID 2438.) Plaintiff has also provided evidence tending to show knowledge of his protected activities by Jane Pesonen and Diane Flournoy, two other decision-makers that he named in his deposition testimony. (*See* Pl.'s Resp. at 9, Pg ID 2274; Pl.'s Resp. Ex. 9, Records Related to EEO 4J-481-0056-07 at Pg ID 2487; Pl.'s Resp. Ex. 20, EEO 471-2007-00107X (McCain) at Pg ID 2790.) More broadly, by the beginning of 2009, Plaintiff had filed eight separate EEO complaints on behalf of himself alone, and Plaintiff testified that his penchant for filing EEO complaints against Defendant was well known among managers within and outside

of the region. (2015 Stevenson Dep. 165:2-168:4.)

The "employer's knowledge" issue is a potentially vexing issue in this case given the number of decision-makers Plaintiff has identified. The Court need not reach it, however, since Plaintiff has failed to put forward sufficient evidence of causation. As noted *supra*, Title VII retaliation claims are analyzed using a "but-for" causation standard. *See Laster*, 746 F.3d at 731; *New Breed Logistics*, 783 F.3d at 1070. Plaintiff has failed to show that he would not have been terminated absent his protected activity. Despite almost 19 hours of training and three attempts, Plaintiff did not achieve higher than 26% accuracy when the passing threshold was 95%. Even with an additional 30 days to train, Plaintiff failed the exam. Indeed, the Notice of Separation expressly states these facts as the basis for that decision. (*See* Def.'s Mot. Ex. 12, Notice of Separation at 1, Pg ID 758.)

Plaintiff does not make an affirmative argument as to causation when it comes to his removal for scheme failure, but rather attacks Defendant's stated reason for it from several angles. (*See* Pl.'s Resp. at 18-21, Pg ID 2283-2286.) Such arguments are germane to the pretext stage of the *McDonnell Douglas* analysis, and Plaintiff does not reach this stage of the inquiry, given his failure to raise a genuine issue of material fact regarding causation.

Even if he had, these arguments lack merit. First, Plaintiff asserts that Wesley and Zigman created a listing for a new part-time position two days after terminating

Plaintiff, presumably to imply an ulterior motive on their part. Plaintiff does not explain how this action by Wesley and Zigman is actually inconsistent with the legitimate removal of an employee for repeatedly failing an exam. In any case, Great Lakes Area Labor Relations Specialist Jack Leich testified that the database marked positions as "newly established" that were not in fact new, based on the positions' changed conditions. (Leich Dep. 55:4-57:2.) Plaintiff has not rebutted this evidence.

Second, Plaintiff argues that Defendant treated similarly situated employees who did not have an extensive history of EEO complaints differently than Plaintiff, in that they did not terminate their employment, "or require them to go through arbitration hearings as Stevenson did, to have their employment restored." (Pl.'s Resp. at 19, Pg ID 2284.) Three of the five individuals mentioned in the exhibits Plaintiff cites were not similarly situated to Plaintiff, were not given more preferential treatment than Plaintiff, or both. Julie Coulter and Dinetria Sams were in fact issued removals for scheme failure, but each bid to a different position altogether. (ECF No. 88, Ex. Declaration of Stacey O. Parker ¶¶ 4-5; ECF No. 81, Ex. 36, Declaration of Michael Greene ¶ 7.) Jerome Record was removed for scheme failure but returned to work as a part of a grievance settlement (Greene Decl. ¶ 6), which shows not only that he did not receive preferential treatment by his employer, but also weakens Plaintiff's claim that Record, as a comparator, did not engage in the same sort of protected activities as Plaintiff did. Plaintiff has offered evidence

that Kena Walker was permitted to take the Brightmoor scheme training exam more than three times, which is the number of opportunities Plaintiff was given to pass the Jefferson scheme training. But as Defendant highlighted in its Response to Plaintiff's evidentiary objections, this occurred at a different station with a different manager (which suggests that she was not similarly situated), and Plaintiff testified that he does not know whether and why Walker's manager requested additional time to pass the training. (*See* ECF No. 88 at Pg ID 3884 (citing 2015 Stevenson Dep. 70:14-20).) Moreover, Plaintiff does not offer evidence that he requested additional opportunities to pass the training, and in fact Defendant has offered evidence suggesting that he received an additional 30 days to qualify on the scheme after receiving his initial notice of separation. (*See* Def.'s Mot. Ex. 13, EEO Affidavit of Eugenia Gregory ¶ 16.) Lastly, Maranetta Fields, according to Plaintiff's 2015 deposition testimony, was permitted to work at the Northend station after failing her scheme training, and was ultimately paid $5,000 by Defendant (presumably pursuant to a grievance award) for this reason. Here again, though, Fields worked under a different manager, and Plaintiff admitted that he did not know if her manager requested additional time—and if so, why. (2015 Stevenson Dep. 70:6-13.) All told, either as evidence of a causal link between Plaintiff's protected activity and his removal, or as evidence that Defendant's justification for the removal was pretextual, the facts concerning these other employees are not enough to permit a

reasonable jury to find for Plaintiff.

Finally, Plaintiff argues that Defendant "made no showing that removing Stevenson would promote the efficiency of the [postal] service," and cites *Vidal v. USPS*, 143 F.3d 1475, 1478-1480 (Fed. Cir. 1998), in support of this argument. (Pl.'s Resp. at 20, Pg ID 2285.) In *Vidal*, the Federal Circuit reversed an administrative ruling by the Merit Systems Protection Board that upheld a postal employee's removal based on job qualifications, and held that the national collective bargaining agreement required the USPS to show in those circumstances that removal would promote the efficiency of the service more than retaining the employee. *See Vidal*, 143 F.3d at 1478. This is a Title VII case. This argument is meritless.

For the reasons outlined above, Plaintiff has not met his burden of showing a "but-for" causal connection between his protected activity and his removal for scheme failure. Accordingly, the Court will grant Defendant's Motion for Partial Summary Judgment as to Plaintiff's 2009 removal for scheme failure.

## 5. Removal based on Burkholder award

Defendant also seeks partial summary judgment as to Plaintiff's allegation that his May 2010 removal based on the Burkholder Award was retaliatory. Defendant first argues that Plaintiff adduces no evidence that Plaintiff's protected activities were a "but-for" cause of this removal, and in this regard Defendant is correct. Defendant would be entitled to summary judgment on the issue of Plaintiff's

2010 removal based on the Burkholder Award for this reason alone.

Defendant also raises a pretext argument: that because it held an honest belief that the Burkholder Award justified Plaintiff's 2010 removal, Plaintiff's claim that the removal was retaliatory must fail. Even if a retaliation claim based on Plaintiff's removal did not fail at the *prima facie* stage for lack of causal evidence, Defendant's pretext argument has substantial merit, and would prevail in the pretext analysis.

The "honest belief rule" is a Title VII doctrine that comes into play when, in the final stage of the *McDonnell Douglas* burden-shifting framework, a plaintiff attempts to show that a defendant's proffered reason for the employment action was merely a pretext to cover up the illegal motive. To invoke the "honest belief rule" as a defense against a plaintiff's pretext argument, "the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 708 (6th Cir. 2006) (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 806-07 (6th Cir. 1998)). In *Wright*, the Sixth Circuit held that

> [i]n determining whether an employer reasonably relied on the particularized facts then before it, we do not require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action. Although we will not micro-manage the process used by employers in making their employment decisions, we also will not blindly assume that an employer's description of its reasons is honest.

44

*Id.* (internal quotation marks and citations omitted).

Here, Defendant argues that the decision to remove Plaintiff in 2010 was based on the honest belief that the Burkholder Award not only justified but in fact required Plaintiff's removal. The fact that that interpretation was later ruled by Arbitrator Cannavo to be erroneous, Defendant argues, does not mean that it was bogus. As evidence of its honest belief, Defendant provides a letter written by human resources manager Lee Ward to APWU President Christopher Ulmer four days after Plaintiff's removal, in which Ward stated that while he recognized "the concern that is raised because of the award," he nonetheless believed that the Burkholder Award required Plaintiff's removal, principally because it failed to expressly limit its scope to back pay. (Def.'s Mot. Ex. 23, 5/14/10 Letter.)

Plaintiff counters this argument by characterizing Defendant's interpretive error as "too obvious to be unintentional," such that under Sixth Circuit precedent it weighs in favor of a finding of pretext. (Pl.'s Resp. at 22, Pg ID 2287 (quoting *Smith*, 155 F.3d at 807).) Plaintiff supports this point by citing internal emails from what appear to be officials in Defendant's Labor Relations divisions, which show that Arbitrator Cannavo's unfavorable ruling did not come as a surprise to the USPS. (*See* Pl.'s Resp. Ex. 74, J. Moore Email of 2/7/12; Pl.'s Resp. Ex. 75, M. Hercules Email of 3/7/12.) In its Reply, Defendant states accurately that the issue before Arbitrator Burkholder was whether Defendant's removal for scheme failure should

be upheld, and argues that it was reasonable to interpret the Burkholder Award—which determined that the removal was properly made but made no mention of remedy—as requiring a return to the status quo immediately after that removal.

The Cannavo Award is fairly scathing in its condemnation of Defendant's interpretation of the Burkholder Award, noting that "there is nothing in the National Agreement, Handbooks and Manuals and arbitral authority and customs and practices that would justify [Defendant]'s actions in this case." (Cannavo Award at 99, Pg ID 3499.) Defendant's internal emails that Plaintiff has proffered as evidence, moreover, do demonstrate some disagreement among certain USPS officials over whether removing Plaintiff was in fact justified by to the Burkholder Award. But this evidence is ultimately unavailing to Plaintiff: at most, it goes to establish that Defendant's initial interpretation of the Burkholder Award was wrongheaded—not that it was pretextual. Under the "honest belief" doctrine, evidence that a belief by the defendant was incorrect—or, for that matter, evidence that it was accompanied by some doubts—does not constitute evidence that the belief was not honestly held.

In any event, Plaintiff's failure to present evidence that would allow a reasonable jury to find that he would not have been removed but for his protected activity amounts to a failure of proof on the causation prong of the *McDonnell Douglas* inquiry. This conclusion is further supported by Defendant's evidence that Defendant offered to settle the grievance by reinstating Plaintiff at the Brightmoor

station—an action which is difficult to square with a retaliatory motive—and Plaintiff declined the offer. (*See* Def.'s Mot. Ex. 19, 9/30/11 Email at Pg ID 786.) For these reasons, the Court will grant Defendant's Motion for Partial Summary Judgment as to Defendant's removal of Plaintiff pursuant to the Burkholder Award.

### 6. Denial of reinstatement request

The final discrete act on which Defendant seeks summary judgment is its denial of Plaintiff's request for reinstatement in June 2011. Defendant argues that a retaliation claim based on this factual predicate fails both at the causation prong of the *prima facie* stage and at the pretext stage, chiefly because contemporaneous evidence shows that his reinstatement request was denied because the vacancies in response to which Plaintiff submitted the request were open only to current (and not former) employees. Zigman confirmed in a September 30, 2012 email that those vacancies had been "open to current career employees ONLY." (Def.'s Mot. Ex. 19, 9/30/11 Email at Pg ID 785.) Moreover, the June 1, 2011 letter that Plaintiff received in which Defendant denied his reinstatement request stated as follows:

> This is in response to your letter dated January 21, 2011 regarding reinstatement into the Postal Service.
>
> Regrettably, the Postal Service is not considering requests for reinstatement from former employees. Due to the downturn in the economy and the erosion of first class mail volume, the Postal Service is reviewing other options to remain viable.

(Def.'s Mot. Ex. 27, 6/1/11 Letter.) Defendant also notes that in his 2015 deposition, Plaintiff was unable to identify any employees who were reinstated in 2011, and testified that the governing collective bargaining agreement allowed but did not require Defendant to reinstate employees. (2015 Stevenson Dep. 213:8-214:8.)

Plaintiff does not respond to this argument in his Response, and indeed does not discuss this theory of his retaliation claim in the Response at all. For that reason, the Court deems Plaintiff to have abandoned this basis for the claim. *See Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) ("This Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment.") (collecting cases); *see also Phillips v. UAW Int'l*, 149 F. Supp. 3d 790, 798 (E.D. Mich. 2016) ("The plaintiff appears to have raised claims for disparate treatment and retaliation under Title VII . . . , which the defendants challenge in their motion for summary judgment. However, the plaintiff has offered no argument in defense of either claim. A plaintiff abandons undefended claims.") (collecting cases).

Even if it were otherwise, Defendant's argument is persuasive on its face. Unrebutted record evidence tends to show that Defendant was not granting reinstatement requests at the relevant time, and this would defeat a retaliation claim premised on Defendant's denial of Plaintiff's reinstatement request both at the

causation prong of the *prima facie* stage, and at the pretext stage. Accordingly, the Court will grant Defendant's Motion for Partial Summary Judgment as to Defendant's 2011 denial of Plaintiff's reinstatement request.

## C.   Constructive Discharge and Front Pay

The final issue raised in Defendant's Motion for Partial Summary Judgment concerns constructive discharge and front pay. Defendant argues that an award of front pay based on constructive discharge requires the plaintiff to adduce, among other things, "evidence to show that . . . the employee actually quit." (Def.'s Mot. at 26, Pg ID 567 (quoting *Regan v. Faurecia Auto. Seating, Inc.*, 679 F.3d 475, 481 (6th Cir. 2012)).) Because Plaintiff is on leave from the USPS with the option to return, Defendant argues, he has no claim for constructive discharge and is therefore not entitled to front pay. Plaintiff counters that he never pled a claim for constructive discharge, but maintains that front pay may still be warranted under Sixth Circuit precedent establishing that front pay may be an appropriate remedy if the plaintiff has found other work, or if there is hostility between the parties. (*See* Pl.'s Resp. at 26-27, Pg ID 2291-92 (citing *Hudson v. Reno*, 130 F.3d 1193, 1202 (6th Cir. 1997)).) Plaintiff argues that both of these factors are present here: the union position in Chicago for which Plaintiff is on leave from the USPS is "other work," and there is hostility between the parties, demonstrated most strongly by evidence that Defendant has called the postal police against Plaintiff on certain occasions. (*See id.*;

49

*see also* 2015 Stevenson Dep. 76:13-22, 104:9-18; 185:4-186:3.)

It is not obvious that Plaintiff's current position constitutes "other work" under *Hudson*. The Sixth Circuit explained in that decision that while reinstatement is presumptively appropriate in Title VII actions that call for an equitable remedy, front pay may be a preferable alternative if the plaintiff has found other work. *See Hudson*, 130 F.3d at 1202; *see also Slayton v. Ohio Dep't of Youth Servs.*, 206 F.3d 669, 680 (6th Cir. 2000) (noting that "reinstatement is the presumptively favored equitable remedy" but that the "presumption may be negated where reinstatement requires the displacement of an uninvolved third party, where hostility would result, or where the plaintiff has found other work") (internal quotation marks and citations omitted). Whether this principle applies to a case like Plaintiff's, in which reinstatement appears to be an option that the plaintiff him- or herself can exercise, is unclear.

Plaintiff has made at least a minimal showing of hostility between the parties, however. And significantly, much of the factual basis for Plaintiff's claim of ongoing hostility—such as Defendant's calling the postal police against him—pertains to grounds for Plaintiff's claims that are outside the scope of Defendant's Motion for Partial Summary Judgment. For this reason, summary judgment on the issue of front pay would be premature at this time. Accordingly, the Court will deny Defendant's Motion for Partial Summary Judgment to the limited extent that it seeks summary

judgment on the issue of front pay.

**D.      Referral to Facilitative Mediation**

For the reasons set forth above, the Court will grant Defendant's Motion for Partial Summary Judgment on all of the grounds raised in that Motion except for the remedial issue of front pay. With the issues in this action thus narrowed, the Court finds that there is a substantial likelihood that facilitative mediation could assist in the prompt resolution of this matter. Accordingly, the Court will refer this matter to facilitative mediation pursuant to E.D. Mich. L.R. 16.4.

The parties shall select a Mediator of their choice and shall inform the Court, within **thirty (30) days** after the date of this Opinion and Order, of their selection of a Mediator and scheduled date for facilitation. The facilitative mediation shall be completed within **one hundred and twenty (120) days** after the date of this Opinion and Order, and shall be conducted at the time and location designated by the Mediator after consultation with the parties. The Mediator shall have discretion to schedule additional sessions as necessary, provided the mediation is completed by the date specified above. The parties shall pay the Mediator's administrative fee and hourly rate, which shall be divided equally between the parties.

The facilitative mediation shall be conducted in the manner and method prescribed by E.D. Mich. L. R. 16.4. All parties or individuals with settlement authority are required to attend the facilitative mediation sessions. All parties are

directed to attend all scheduled mediation sessions with their respective counsel of record. Further, pursuant to Federal Rule of Evidence 408, all information disclosed during the facilitative mediation session shall remain confidential, and shall not be disclosed to any other party or to this Court, without the consent of the parties. The Mediator shall not be called as a witness nor may the Mediator's records be subpoenaed or used as evidence.

Within 10 days of completion of the final facilitative mediation session, the Mediator will file a brief report with the Court stating only who participated in the facilitative mediation sessions and whether a settlement was reached. The post-facilitation report is not to contain any additional information which may breach the principles of confidentiality and privacy noted herein. This referral is not a substitute for further proceedings in this Court and the matter will proceed in this Court in the event settlement is not reached.

## IV.    CONCLUSION

For all of the reasons stated above, the Court hereby:

- GRANTS Defendant's Motion for Partial Summary Judgment as to Plaintiff's gender discrimination claim asserted in Count I of the Fourth Amended Complaint, to the extent that that claim is premised on Plaintiff's 2004 rescinded suspension or on Plaintiff's 2009 removal for scheme failure;

- GRANTS Defendant's Motion for Partial Summary Judgment as to Plaintiff's retaliation claim asserted in Count II of the Fourth Amended

52

Complaint, to the extent that that claim is premised on the excessing procedures in late 2009 and early 2010, Plaintiff's 2009 removal from a Brightmoor bid award and reassignment to Jefferson, Plaintiff's 2009 removal for scheme training failure, Plaintiff's 2010 removal pursuant to the Burkholder Award, and Defendant's denial of Plaintiff's 2011 reinstatement request;

- DENIES Defendant's Motion for Summary Judgment on the remedial issue of front pay; and
- ORDERS the parties to conduct facilitative mediation pursuant to E.D. Mich. L.R. 16.4, and under the terms set forth in Section III.D of this Opinion and Order.

IT IS SO ORDERED.

Paul D. Borman
United States District Judge

Dated: 3/12/2018